# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 10, 2020       Decided August 20, 2021

No. 20-1024

LOUISIANA PUBLIC SERVICE COMMISSION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ENTERGY SERVICES, LLC AND ARKANSAS PUBLIC SERVICE
COMMISSION,
INTERVENORS

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

*Michael R. Fontham* argued the cause for petitioner. With him on the briefs were *Dana M. Shelton* and *Justin A. Swaim*.

*Lona T. Perry*, Deputy Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *David L. Morenoff*, Acting General Counsel, and *Robert H. Solomon*, Solicitor.

*Glen Ortman, Dennis Lane*, *Gregory W. Camet*, *Mark Strain*, and *Marnie A. McCormick* were on the brief for intervenors Entergy Services, LLC and Arkansas Public

2

Service Commission in support of respondent. *Jennifer S. Amerkhail* and *Marie Denyse Zosa* entered appearances.

Before: HENDERSON, PILLARD, and KATSAS, *Circuit Judges*.

Opinion of the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: The Federal Energy Regulatory Commission required Entergy Corporation's five operating companies to roughly equalize their electricity production costs. In determining which costs must be equalized, FERC excluded purchased-power costs that a Louisiana affiliate incurred in 2005 and amortized in 2008 and 2009. The agency reasoned that the governing tariff excluded the disputed amortization expenses. The Louisiana Public Service Commission (LPSC) challenges this exclusion.

I

Entergy, a public-utility holding company, owns five operating companies that sell electricity in four states, including Louisiana. The companies have been governed by a system agreement requiring them to act as a "single economic unit." *LPSC v. FERC*, 184 F.3d 892, 894 (D.C. Cir. 1999) (*LPSC I*). The agreement provided for the companies to operate power facilities jointly, and it required a "rough equalization" of their production costs. *LPSC v. FERC*, 522 F.3d 378, 383–84 (D.C. Cir. 2008) (*LPSC II*) (cleaned up).[1]

FERC has long reviewed the operating companies' allocation of production costs, which affect electricity rates. *See LPSC II*, 522 F.3d at 389–90. In 2005, FERC determined

---

[1] The agreement terminated in August 2016, after the events underlying this petition.

that the production costs were not roughly equal and imposed a "bandwidth remedy" to achieve rough equalization after the fact: Whenever the yearly production costs of an individual operating company deviated from the average by more than 11%, companies with lower costs were required to pay companies with higher costs as necessary to bring all five companies within that range. *LPSC*, 111 FERC ¶ 61,311, PP 28, 145 (2005). Although FERC initially made the bandwidth remedy effective in 2006, we set aside that effective date in 2008. *See LPSC II*, 522 F.3d at 400. In 2011, on remand from this Court, FERC extended the bandwidth remedy to production costs incurred on or after June 1, 2005. *See LPSC*, 137 FERC ¶ 61,047, P 34 (2011).

In the meantime, Entergy filed a tariff establishing a formula to calculate production costs subject to the bandwidth remedy, which FERC largely accepted. *LPSC*, 117 FERC ¶ 61,203, P 75 (2006). The formula incorporated cost data from the operating companies' annual Form 1 reports, which classify assets and expenses according to FERC's Uniform System of Accounts. *See* 18 C.F.R. pt. 101. The bandwidth formula was keyed mostly to these FERC accounts. The formula included a variable for purchased-power expenses (PURP), which utilities incur when buying power on wholesale markets. PURP incorporated expenses recorded in FERC Account 555, which covers purchased-power expenses. *See id.* pt. 101, acct. 555.

The bandwidth remedy led to annual compliance proceedings. In April of each year, the operating companies would report production-cost data for the preceding year on Form 1. Using that data, Entergy would determine whether any of its operating companies fell outside the 11% bandwidth and report the results to FERC.

This petition concerns how the bandwidth formula accounts for deferred production costs. Utilities often must spread over many years their recovery of large, non-recurring costs. To do this, a company offsets those costs by creating a regulatory asset—a type of *credit*. The company then amortizes the asset in later years, creating *debits* chargeable to customers. Over time, FERC and Entergy have taken different positions on whether the bandwidth formula should recognize these production costs when an operating company incurs them or in later years as it amortizes the associated regulatory asset.

Historically, the Entergy companies recorded regulatory assets and their related amortization expenses in two FERC accounts not referenced in the bandwidth formula—Account 407.3 (Regulatory Debits) and Account 407.4 (Regulatory Credits). Entergy continued this practice in its first bandwidth filing, the 2007 filing concerning 2006 production data. In excluding regulatory assets and their amortization from the bandwidth calculation, Entergy effectively accounted for deferred production costs when they were incurred, rather than when the related amortization expenses were recorded. But FERC rejected this approach. It prohibited the companies from recording regulatory assets and amortization expenses in Accounts 407.3 and 407.4 when the assets and expenses could be traced to another account. *See Entergy Servs., Inc.*, 130 FERC ¶ 61,023, PP 261–65 (2010). And when the assets and expenses could be traced to accounts incorporated into the bandwidth formula, it ordered Entergy to treat amortization expenses as production costs for purposes of the formula. *See LPSC*, 132 FERC ¶ 61,253, P 34 (2010).

Perhaps anticipating these rulings, Entergy revised its accounting for deferred purchased-power costs during the 2008 bandwidth proceedings for 2007 cost data. Because the regulatory assets and related amortization expenses could be

traced to Account 555, Entergy began recording them there, rather than in Accounts 407.3 and 407.4. And because the bandwidth formula defined purchased-power expenses by reference to Account 555, this approach included amortization expenses in the bandwidth calculation. Entergy thus counted deferred purchased-power costs when the associated regulatory assets were amortized, rather than when the underlying costs actually were incurred.

LPSC challenged this approach, and the parties reached a settlement. *See Entergy Servs., Inc.*, 128 FERC ¶ 61,181 (2009). It required Entergy to amend the bandwidth formula "starting with the 2009 Bandwidth Calculation (i.e., effective May 31, 2009) to provide that all purchased power costs will be included in the Bandwidth Calculation in the year the costs are incurred, regardless of whether they are deferred on the individual Operating Company's books." J.A. 1298.

Pursuant to the settlement, Entergy proposed amending the definition of PURP. Under the amendment, PURP still would include most purchased-power expenses recorded in Account 555, but it would "exclud[e] the effects, debits and credits, resulting from a regulatory decision that causes the deferral of the recovery of current year costs or the amortization of previously deferred costs." J.A. 1327. FERC accepted the proposal and made the amendment effective May 31, 2009, before the 2009 bandwidth proceedings. *See Entergy Servs., Inc.*, 128 FERC ¶ 61,069, P 11 (2009). Under the amendment, the bandwidth formula again considered deferred purchased-power costs when the operating companies incurred them, not when the companies amortized the relevant regulatory assets.

This petition concerns application of the amendment to the 2009 and 2010 bandwidth proceedings, which involve production costs for 2008 and 2009. FERC reopened these

proceedings after it discovered accounting errors in the delayed bandwidth proceeding for 2005 production costs. There, an administrative law judge ruled that the operating companies had erroneously recorded certain regulatory assets and their associated amortization expenses in Accounts 407.3 and 407.4. *LPSC*, 157 FERC ¶ 63,018, P 101 (2016). One of these deferrals is at issue—a $56.3 million purchased-power cost that Entergy Louisiana, one of the operating companies, incurred in 2005. To blunt its impact on ratepayers, LPSC had ordered the company to establish a regulatory asset and amortize it over four years. *Id.* The ALJ ruled that Entergy Louisiana should have recorded the asset and its amortization in Account 555, and that Entergy had to revise the bandwidth calculation accordingly. *Id.* PP 113–14. FERC agreed, but stressed that any corrections "should be limited to accounting adjustments that have been shown to have a bandwidth implication." *LPSC*, 163 FERC ¶ 61,116, PP 119–20 (2018) (Recalculation Order). Recognizing that the error implicated the bandwidth calculations for later years, FERC ordered Entergy Louisiana to refile its Form 1 report and ordered Entergy to adjust bandwidth payments for subsequent years "to ensure that legitimate production costs are properly accounted for on the FERC Form 1 reports and reflected in rates under the filed formula." *Id.* P 121.

Entergy corrected the accounting and bandwidth calculations for the $56.3 million regulatory credit that Entergy Louisiana received in 2005 and the associated amortization expenses that it recorded in 2006 and 2007. But Entergy did not change its calculations for the amortization expenses recorded in 2008 and 2009. It reasoned that those expenses would not affect the bandwidth remedy under the 2009 amendment, which expressly excluded amortization expenses from the calculation of purchased-power costs.

Entergy's calculation locked a portion of Entergy Louisiana's $56.3 million production cost out of the bandwidth remedy. When Entergy Louisiana incurred that cost in 2005, the bandwidth formula recognized deferred purchased-power costs only upon amortization, so the bandwidth calculation for 2005 did not account for the costs. But for amortization expenses realized in 2008 and 2009, Entergy read the amended bandwidth formula to recognize deferred purchased-power costs only when they were actually incurred, so its revised calculations excluded those amortization expenses. As a result, Entergy Louisiana never received bandwidth credit for portions of the 2005 production cost that it amortized in 2008 and 2009.

FERC agreed with Entergy that the 2009 amendment excluded these amortization expenses. *LPSC*, 167 FERC ¶ 61,186, PP 23–25 (2019) (Compliance Order). It reasoned that because the amended bandwidth formula was part of the filed rate, FERC could not include the amortization expenses in the bandwidth calculation. *Id.* P 29. On rehearing, FERC rejected LPSC's proposed interpretation of the 2009 amendment and its fallback arguments for departing from the amendment. *See LPSC*, 169 FERC ¶ 61,247 (2019) (Rehearing Order).

LPSC now seeks review of FERC's ruling. We have jurisdiction to consider its petition under 16 U.S.C. § 825*l*(b).

II

We review FERC orders under the Administrative Procedure Act, which requires us to set aside decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Verso Corp. v. FERC*, 898 F.3d 1, 7 (D.C. Cir. 2018). In a "technical area like electricity rate design," we give FERC a significant degree of deference. *FERC v. Elec. Power Supply Ass'n*, 577

U.S. 260, 292 (2016). We must accept FERC's factual findings if they are "supported by substantial evidence." 16 U.S.C. § 825*l*(b). We must also defer to FERC's reasonable interpretation of tariffs, *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011), and of its own prior orders, *NSTAR Elec. & Gas. Corp. v. FERC*, 481 F.3d 794, 799 (D.C. Cir. 2007).

The Federal Power Act requires electric utilities to charge "just and reasonable" rates. 16 U.S.C. § 824d(a). If FERC finds that a rate is unreasonable, it may establish a just and reasonable rate. *Id.* § 824e(a). Under this authority, FERC may reallocate production costs under the Entergy system agreement, including by ensuring compliance with the bandwidth remedy. *LPSC II*, 522 F.3d at 390–91. But because the bandwidth formula is part of a filed rate, FERC's discretion is significantly limited. *See LPSC v. FERC*, 771 F.3d 903, 910 (5th Cir. 2014) (*LPSC III*); *LPSC v. FERC*, 606 F. App'x 1, 4 (D.C. Cir. 2015) (*LPSC IV*). Under the filed-rate doctrine, a utility "may not charge, or be forced by [FERC] to charge, a rate different from the one on file." *SFPP, L.P. v. FERC*, 967 F.3d 788, 801–02 (D.C. Cir. 2020) (cleaned up); *see also* 16 U.S.C. § 824d(c), (d) (requiring regulated utilities to prospectively file rates with FERC). As a corollary, FERC may adjust rates only prospectively. *See id.* § 824e(a). It cannot alter rates to retroactively correct for a past under-collection. *Verso Corp.*, 898 F.3d at 10.

A

Because this case turns on the effect of the 2009 amendment, we first decide what it means. We review FERC's tariff interpretations with a "*Chevron*-like analysis." *PSEG*, 665 F.3d at 208 (cleaned up). Under that framework, we must

enforce unambiguous tariff language, but we defer to FERC's reasonable interpretation of ambiguous text. *Id.*

The 2009 amendment added the emphasized language to the definition of the PURP variable in the bandwidth formula:

> PURP = Purchased Power Expense recorded in FERC Account 555, but excluding payments made pursuant to Section 30.09(d) of this Service Schedule *and excluding the effects, debits and credits, resulting from a regulatory decision that causes the deferral of the recovery of current year costs or the amortization of previously deferred costs*.

J.A. 1327 (emphasis added). The parties dispute whether the amendment applies to costs that are amortized after its adoption but rest on deferral decisions that predate it. FERC and Entergy contend that the amendment does so apply, while LPSC contends that it does not.

We agree with FERC, for nothing in the amendment turns on the timing of a deferral decision. The amendment does not target deferral decisions as such, but rather their "effects." So long as a purchased-power expense arises after the amendment's effective date and results from a deferral decision, the amendment applies by its terms. And when a regulatory decision orders a company to amortize a previously incurred cost over several years, the ensuing amortizations plainly qualify as such "effects."

In response, LPSC highlights the phrase "debits and credits." It argues that the amendment applies only if it would exclude *both* the debits and credits associated with a particular deferral decision. And so, LPSC concludes, the amendment does not exclude the "debits" of a preexisting deferral decision

because the related "credits" occurred at the time of the deferral—before the amendment had become effective.

LPSC's interpretation defies grammar. As nouns set off by commas, "debits and credits" are "explanatory equivalent[s]" of "effects," the immediately preceding noun. *Appositives*, *The Chicago Manual of Style* § 6.28 (17th ed. 2017); *see* R. Huddleston & G. Pullum, *The Cambridge Grammar of the English Language* 1357–58 (1st ed. 2002). In this context, "and" assumes its "distributive sense"—*i.e.*, it means "A and B, jointly *or severally*." *Or and And*, *Garner's Dictionary of Legal Usage* (3d ed. 2011) (emphasis added); *see also* Huddleston & Pullum, *supra*, at 1281 (distributive sense is the "default"). The amendment treats debits and credits as distinct classes of excluded "effects." After all, an effect is "[s]omething brought about by a cause or agent; a result." *Effect*, *American Heritage Dictionary* (5th ed. 2018). And no fair reading of that term requires *both* a debit and a credit to constitute an effect resulting from a deferral decision. Instead, debits that arise from a deferral decision are "effects" of the decision regardless of whether the amendment also happens to cover a related credit.

LPSC's interpretation is also in tension with the rest of the amendment, which contemplates decisions that create only debits or only credits. Recall that the amendment excludes the effects of regulatory decisions that cause "the deferral of the recovery of current year costs *or* the amortization of previously deferred costs." J.A. 1327 (emphasis added). A decision that requires a company to defer cost recovery causes only a credit, while a decision that permits the company to amortize previously deferred costs causes only debits. By listing these causes disjunctively, the amendment confirms its extension to regulatory decisions that cause only credits or only debits. In contrast, to apply only to decisions that cause both a credit and

a debit, the amendment would have had to cover regulatory decisions that cause "the deferral of the recovery of costs *and* the amortization of *those* costs."

LPSC next argues that other evidence, such as trial testimony and the settlement agreement that precipitated the amendment, show an intent to limit the amendment to later deferral decisions. According to LPSC, the settlement agreement is particularly important because it too is part of the filed rate. But because the amendment "unambiguously addresses the matter at issue," its language controls. *PSEG*, 665 F.3d at 208 (cleaned up). As for the settlement agreement, it simply required Entergy to amend the definition of the PURP variable in the future; the agreement itself did not alter the bandwidth formula, so it is not part of the filed rate.[2]

In sum, the 2009 amendment is not limited to deferral decisions that postdate it. So long as an amortized purchased-power expense "result[s] from" a deferral decision, the amendment applies.

## B

Our construction of the 2009 amendment largely resolves this appeal. As noted, the bandwidth formula is part of the filed rate. *See LPSC III*, 771 F.3d at 910; *LPSC IV*, 606 F. App'x at 4. In the proceedings below, FERC found that the amendment was part of the bandwidth formula—and thus the filed rate—

---

[2] To the extent LPSC contends that the settlement agreement should control over the amendment, we cannot consider its argument. The 60-day deadline to challenge FERC's order approving the 2009 amendment has long expired. *See* 16 U.S.C. § 825*l*(b). Challenging the validity of that amendment would constitute an untimely collateral attack on the order approving it. *See Pac. Gas & Elec. Co. v. FERC*, 533 F.3d 820, 825 (D.C. Cir. 2008).

for the 2009 and 2010 proceedings. *See* Rehearing Order, 169 FERC ¶ 61,247, P 29; Compliance Order, 167 FERC ¶ 61,186, P 25. This ruling, which no party disputed below, is consistent with FERC's order accepting the amendment and ruling that it was effective for the 2009 bandwidth proceedings. *Entergy Servs., Inc.*, 128 FERC ¶ 61,069, P 11.

This finding obligated Entergy to exclude the disputed expenses from the bandwidth calculation. Even though the purchased-power expenses that Entergy Louisiana amortized in 2008 and 2009 were recorded in Account 555, they were also "effects" (or "debits") "resulting from a regulatory decision that causes the deferral of the recovery of current year costs." The 2009 amendment thus unambiguously excluded them from the bandwidth calculation. And FERC was bound to enforce the amendment as part of the filed rate, which it could not waive or retroactively amend. *See NSTAR*, 481 F.3d at 800.

C

LPSC raises three fallback arguments to support including the amortized expenses in the bandwidth formula despite the 2009 amendment. They are unpersuasive.

First, LPSC contends that FERC failed to follow its Recalculation Order, which required Entergy to adjust bandwidth payments after correcting the accounting errors uncovered in the 2005 bandwidth proceeding. 163 FERC ¶ 61,116, P 121. LPSC claims that this required Entergy to include amortization expenses in its subsequent bandwidth calculations for later years. But the Recalculation Order mandated corrections to ensure that Entergy Louisiana's expense was "reflected in rates under the filed formula." *Id.* And beginning with bandwidth calculations for 2008 expenses, the "filed formula" included the 2009 amendment, which FERC was bound to apply. *See NSTAR*, 481 F.3d at 800.

Second, LPSC contends that applying the amendment to expenses that stem from the 2005 deferral decision would violate the prohibition on retroactive ratemaking. According to LPSC, the 2005 rate must govern because it was effective when LPSC ordered Entergy Louisiana to defer recovering the $56.3 million expense. By changing the applicable rate, LPSC reasons, FERC retroactively removed a benefit that Entergy Louisiana could reasonably expect to receive.

LPSC misunderstands the rule against retroactive ratemaking. As discussed, the bandwidth remedy turns on production costs recorded in the preceding year. At most, the rule prohibited FERC from changing the rate for expenses that the companies had already recorded. *See NSTAR*, 481 F.3d at 800. For example, as the ALJ in these proceedings held, the rule prohibited applying the 2009 amendment to 2005 production costs, which would have allowed Entergy Louisiana to fully account for its costs. *LPSC*, 157 FERC ¶ 63,018, P 111. Although LPSC's 2005 deferral decision led to the amortization expenses at issue, Entergy Louisiana incurred those expenses in 2008 and 2009. And the rule against retroactive ratemaking does not protect a utility's expectation that a rate will not change in the future. By seeking to change the rate that would otherwise govern production expenses recorded in 2008 and 2009, LPSC itself asks for an improper retroactive rate increase. As FERC correctly concluded, it cannot adjust current rates to make up for "over- or under-collection in prior periods." *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1227 (D.C. Cir. 2018) (cleaned up).

Alternatively, LPSC contends that the rule against retroactive ratemaking at least prohibited FERC from applying the 2009 amendment to expenses that the operating companies had incurred before FERC approved the amendment—that is, to production costs between January 2008 and May 2009.

Because LPSC did not raise this argument before FERC, we cannot consider it. *See* 16 U.S.C. § 825*l*(b). In its rehearing motion, LPSC argued only that the rule required the 2005 rate to govern all amortization expenses related to the deferral. It did not seek to apply the filed rate for the year in which expenses were amortized. Indeed, LPSC asserted to the ALJ that the amendment was "effective beginning with the 2009 Bandwidth filing for the 2008 test year." J.A. 90. And it told FERC that the settlement agreement "unambiguously applies to costs and deferrals going forward, beginning in the 2008 test year used for the 2009 Bandwidth Calculation." J.A. 1335. LPSC cannot now pivot to new arguments that it previously conceded. *See Cal. Dep't of Water Res. v. FERC*, 306 F.3d 1121, 1125 (D.C. Cir. 2002).[3]

Third, LPSC contends that FERC arbitrarily declined to account for the amortized expenses under 16 U.S.C. § 825h, which allows FERC to "perform any and all acts . . . as it may find necessary or appropriate" to enforce the Federal Power Act. But the filed-rate doctrine "restrict[s] the remedies that FERC may order" under § 825h, *Verso Corp.*, 898 F.3d at 10, by depriving it of "discretion to waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations," *Old Dominion*, 892 F.3d at 1230. And, to reiterate, the filed rate required FERC to exclude the disputed expenses from the bandwidth calculation.

LPSC objects that the filed-rate doctrine does not apply "when judicial invalidation of Commission decisions has

---

[3] Given our disposition, we need not consider FERC's alternative ruling that LPSC consented to any retroactive rate. Rehearing Order, 169 FERC ¶ 61,247, P 30; *see also NSTAR*, 481 F.3d at 801 (parties can "agree[] to make a rate effective retroactively" (cleaned up)).

resulted in retroactive changes in rates." *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 22 (D.C. Cir. 2014). But the exception LPSC invokes is narrow: FERC can retroactively correct for legal error only where, among other requirements, the parties "were aware in advance of the risk of litigation-induced change." *Id*. at 23. To create notice, there must be a close link between the claimed error and the change retroactively imposed on remand. Usually this means that the rate itself is subject to challenge, though in one case the challenge concerned the lawfulness of a rate in a settlement agreement that a party had accepted "in reliance on an unlawful FERC order." *Pub. Utils. Comm'n of Cal. v. FERC*, 988 F.2d 154, 162–66 (D.C. Cir. 1993).

Here, there was no notice that the rate set by the 2009 amendment was subject to change. The validity of the amendment itself has never been questioned. Instead, LPSC offers an attenuated chain of causation between an unrelated legal error and approval of the amendment: This Court invalidated FERC's decision to make the bandwidth remedy effective in 2006, which led FERC to extend the remedy to some costs incurred in 2005, which led an ALJ to discover that the operating companies had mistakenly recorded amortization expenses in non-bandwidth accounts. Had the arbitrary effective date not substantially delayed bandwidth proceedings for the 2005 production costs, LPSC continues, Entergy would have discovered the error in time to propose a different 2009 amendment permitting all deferred-production costs to be recognized in the bandwidth calculation. Even assuming that LPSC's inferences are true and that legal errors unrelated to underlying rates can trigger the exception, more than bare, but-for causation is required to overcome the "nearly impenetrable shield" against retroactive ratemaking. *Old Dominion*, 892 F.3d at 1230. The litigation over the bandwidth's start date could not have given notice that an ALJ would find accounting

errors significant enough to affect settlement negotiations over the 2009 amendment. The notice exception to the filed-rate doctrine does not apply. And because the filed-rate doctrine does apply, LPSC's § 825h argument is without merit. *See Verso Corp.*, 898 F.3d at 10.

## III

For these reasons, we deny the petition for review.

*So ordered.*