# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 23-1040**

**September Term, 2023**

FILED ON: June 5, 2024

BIG RIVERS ELECTRIC CORPORATION,
> PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
> RESPONDENT

THE CITY OF HENDERSON, KENTUCKY, UTILITY COMMISSION, D/B/A HENDERSON MUNICIPAL POWER AND LIGHT,
> INTERVENOR

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

Before: SRINIVASAN, *Chief Judge*, GARCIA, *Circuit Judge*, and ROGERS, *Senior Circuit Judge*.

## **J U D G M E N T**

This case was considered on the record from the Federal Energy Regulatory Commission and on the parties' briefs and oral arguments. The Court has accorded the issues full consideration and has determined that they do not warrant a published opinion. *See* D.C. CIR. R. 36(d). It is:

**ORDERED** and **ADJUDGED** that the petition for review be **DENIED.**

\*     \*     \*

Henderson Municipal Power and Light is a Kentucky municipality-owned electric utility that sought and received approval from the Federal Energy Regulatory Commission to join the Midcontinent Independent Transmission System Operator, Inc. ("MISO") as a transmission owner. *Midcontinent Indep. Sys. Operator, Inc.*, 181 FERC ¶ 61,056 (2022), *modified on reh'g*,

182 FERC ¶ 61,095 (2023). Petitioner Big Rivers Electric Cooperative ("BREC") is an electric cooperative with facilities that interconnect with Henderson facilities. BREC challenges the Commission's approval of Henderson as a "transmission owner" as arbitrary and capricious. For the reasons explained below, we deny the petition for review.

# I

## A

The Federal Power Act grants the Commission exclusive jurisdiction over the transmission and sale of electricity in interstate commerce. 16 U.S.C. § 824(b)(1). To promote competition and efficiency, the Commission issued Order No. 888, which "required utilities that owned transmission facilities to guarantee all market participants non-discriminatory access to those facilities," *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363 (D.C. Cir. 2004) (citing *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, 61 Fed. Reg. 21,540 (1996) ("Order No. 888")), and "offer[] transmission service under [a] tariff on an open-access, non-discriminatory basis," *id*. at 1364. Order No. 888 also encouraged the development of multi-utility regional transmission organizations with independent system operators ("ISOs"), in which the "ISO would assume operational control—but not ownership—of the transmission facilities owned by its member utilities" and "provide open access to the regional transmission system to all electricity generators at rates" listed in a Commission-approved tariff. *Id*.

MISO is one such ISO. Utilities that join MISO sign the Transmission Owners Agreement, giving up operational control of their transmission facilities and allowing MISO to control, among other things, "transmission availability and capacity." *E. Ky. Power Co-Op, Inc. v. FERC*, 489 F.3d 1299, 1303 (D.C. Cir. 2007). The utilities "retain[] ownership and physical control over the facilities, but operate[] them according to MISO's instructions." *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 248 (D.C. Cir. 2007) (per curiam). MISO then distributes revenues back to the utilities by setting up "pricing zones" based on the geographic areas where the utilities operate.

As relevant here, there are two requirements to join MISO. First, an entity must be a transmission owner, meaning it must "own[] or control[]" its facilities. J.A. 446 (excerpt of MISO's Transmission Owners Agreement). Second, the facilities must be used for transmission rather than local distribution because the Commission does not have jurisdiction over local distribution facilities. 16 U.S.C. § 824(b)(1). The Commission employs a seven-factor test to determine whether facilities qualify as transmission or distribution. Order No. 888, 61 Fed. Reg. at 21,619–20, 21,626. The factors are:

> (1) Local distribution facilities are normally in close proximity to retail customers. (2) Local distribution facilities are primarily radial in character. (3) Power flows into local distribution systems; it rarely, if ever, flows out. (4) When power enters

a local distribution system, it is not reconsigned or transported on to some other market. (5) Power entering a local distribution system is consumed in a comparatively restricted geographical area. (6) Meters are based at the transmission/local distribution interface to measure flows into the local distribution system. (7) Local distribution systems will be of reduced voltage.

*Id*. at 21,620.

**B**

BREC is an electric cooperative that operates in twenty-two counties in Kentucky. BREC signed the Transmission Owners Agreement with MISO in 2010, and MISO then amended its Tariff to add a pricing zone for the area served by BREC's facilities. Since then, MISO has controlled and offered transmission service over BREC's facilities and distributed transmission revenue to BREC. Henderson is a Kentucky municipality that owns and operates an electric utility which interconnects with BREC's facilities at six tie lines. Henderson applied to join MISO as a transmission owner and MISO approved the request in 2018. MISO listed certain Henderson substations, transformers, and transmission lines as transmission facilities to be turned over to MISO.

On behalf of Henderson, MISO filed with the Commission tariff amendments—which added Henderson as a transmission owner—and a Joint Pricing Zone Agreement between Henderson and BREC, which allocated revenues between BREC and Henderson because Henderson's facilities serve a portion of the same area that BREC's facilities serve. BREC protested both filings and the Commission consolidated those dockets. During settlement negotiations in July 2019, BREC discontinued one of the six tie lines that interconnect BREC and Henderson's facilities, the Sub4-Sub4Tap69 line, stating it was a "system reconfiguration." After settlement negotiations failed, an ALJ held evidentiary hearings and then issued an Initial Decision in favor of MISO and Henderson. Initial Decision, *Midcontinent Indep. Sys. Operator, Inc.*, 174 FERC ¶ 63,007 (Jan. 19, 2021). BREC filed exceptions, and the Commission affirmed the ALJ in all respects. Order on Initial Decision, *Midcontinent Indep. Sys. Operator, Inc.*, 181 FERC ¶ 61,056 (Oct. 20, 2022) ("Affirming Order"). BREC timely requested rehearing, challenging the Commission's conclusion that Henderson "owned or controlled" the facilities and determination that Henderson's facilities were "transmission" facilities under the seven-factor test. The Commission denied the petition for rehearing and affirmed its prior orders. Order Addressing Arguments Raised on Rehearing, *Midcontinent Indep. Sys. Operator, Inc.*, 182 FERC ¶ 61,095 (Feb. 16, 2023). BREC appealed.

**II**

Under the Administrative Procedure Act, we shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We consider whether the

Commission "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). "We must accept FERC's factual findings if they are 'supported by substantial evidence.'" *La. Pub. Serv. Comm'n v. FERC*, 10 F.4th 839, 845 (D.C. Cir. 2021) (quoting 16 U.S.C. § 825*l*(b)).

**A**

BREC challenges as arbitrary and capricious the Commission's conclusion that Henderson qualifies as a "transmission owner" because it owns and controls its facilities. BREC argues that Henderson did not meet its burden of proof to show it owned the facilities. BREC also argues that the Commission failed to explain why Henderson controlled its facilities, given that BREC and Henderson had contracts limiting Henderson's control.

BREC, however, failed to preserve its argument as to ownership. Our jurisdiction is limited to objections that "have been urged before the Commission in the application for rehearing." 16 § U.S.C. 825*l*(b). This is an "unusually strict requirement." *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1114 (D.C. Cir. 2001). Here, the Initial Decision separately discussed Henderson's evidence of ownership and of control. J.A. 375–76, 382–83, 389–90. BREC failed to challenge the ownership evidence in either its brief in support of exceptions to the Initial Decision or in its rehearing request. Instead, BREC's rehearing request challenged only the Commission's conclusion as to control. *See* J.A. 499, 502. Although the rehearing request quoted the requirement that a transmission owner have "ownership or control" over the facilities, BREC did not raise any argument about the sufficiency of the evidence on ownership or the burden of proof. J.A. 501. Such general references to ownership, without any accompanying argument about how the Commission erred in determining Henderson's ownership, are insufficient to properly raise the argument to the Commission on rehearing. *See Citadel FNGE Ltd. v. FERC*, 77 F.4th 842, 861 (D.C. Cir. 2023).

The Commission concluded that ownership and control are "separately sufficient" ways to qualify as a transmission owner, J.A. 517, and BREC endorses that conclusion, *see* Petitioner's Brief 20. We therefore do not address BREC's challenges to the Commission's finding that Henderson also controls the facilities.

**B**

BREC raises several challenges to the Commission's conclusion that the facilities are "transmission" facilities under the Commission's seven-factor test, but all lack merit.

First, BREC argues that the Commission too "rigidly" applied the seven-factor test and deviated from the approach it took in decisions such as *Southwest Power Pool, Inc.*, 180 FERC ¶ 61,192 (2022). Petitioner's Brief 29; Reply Brief 20. We find that the Commission's

Affirming Order reasonably analyzed each factor individually, cited relevant record evidence for its conclusions as to each factor, and considered the totality of the circumstances. *See* J.A. 472–73 (Factor 1); J.A. 475–76 (Factor 2); J.A. 479–80 (Factor 3); J.A. 484–85 (Factor 4); J.A. 488 (Factor 5); J.A. 490 (Factor Six); J.A. 491 (Factor 7); J.A. 467–68, 484–85 (totality of circumstances). The Commission also reasonably distinguished its prior decision in *Southwest Power Pool* by explaining in detail why the differences between that proceeding and this one led to different conclusions. *See* J.A. 519–22.

BREC next contests the Commission's analysis of power flow for several factors such as Factor 3, which states that "[p]ower flows into local distribution systems; it rarely, if ever, flows out." Order No. 888, 61 Fed. Reg. at 21,620. For those factors, the Commission relied largely on MISO's data exhibits and expert testimony, which demonstrated that "power can and does flow into and out of the Henderson Facilities." J.A. 479; *see also* J.A. 484. The MISO analysis showed that after the system reconfiguration that disconnected one tie line, "there was a notable increase in the percentage of hours flowing out" of Henderson's system through another tie line. J.A. 479. The Commission credited MISO's analysis and expert testimony because it was "comprehensive, considered flows under contingency conditions," and considered flows before and after the system reconfiguration. *Id.*

BREC argues that the Commission's error in stating that the Sub4-Sub4Tap69 tie line is owned by Henderson—when it is in fact owned by BREC—infects the entire seven-factor analysis because the Commission considered evidence of flows from that tie line. BREC is incorrect. The Commission relied on power flow data after BREC disconnected Sub4-Sub4Tap69 (the system reconfiguration), J.A. 99–100, and found that those flows still sufficed to support a transmission determination.

BREC does not contest the accuracy of MISO's power flow analysis. Rather, BREC argues that, for factors that analyze power flow, the Commission was required to consider a different metric, net power flow—which compares the amount of power flowing into versus out of Henderson's system—instead of focusing on the percentage of hours of outward power flow. Petitioner's Brief 32. But, as the Commission explained, net power flow "distort[s] . . . the test under Factor 3 because this factor analyzes whether power flows into the system and whether power 'rarely, if ever flows out,' not whether net flows always flow in." J.A. 479–80. The Commission also explained that no precedent supported use of net power flow. *See* J.A. 473 (Factor 1); J.A. 479–80 (Factor 3); J.A. 484 (Factor 4). Indeed, BREC did not point to any such precedent in its rehearing request. J.A. 505–08. Therefore, the Commission reasonably looked to a different metric, the percentage of hours that power flowed out of Henderson's system, to analyze whether power "rarely" flows out under Factor 3. J.A. 479. The Commission's decision not to use net power flow and explanation for not doing so is not arbitrary and capricious.

BREC also argues that on several factors the Commission focused too much on the technical capacity of Henderson's facilities rather than on how they operate in reality. But the Commission did consider how the facilities function in reality. For Factors 3, 4, and 5, which all

5

relate to power flow, the Commission relied on MISO's analysis, which accounted for flows "under normal and certain contingency conditions." J.A. 89–90; J.A. 488 (describing the analysis as encompassing a "variety of system conditions"). Indeed, the analysis found that after the system reconfiguration, power flowed from the Henderson facilities—including 8.9% of the time over one tie line—under normal operating conditions and also flowed out of Henderson during "certain contingency conditions." J.A. 99–100. For Factor 2, which considers whether the facilities are primarily radial (indicating local distribution) or looped (indicating transmission), the Commission examined both the technical design of the facilities and how they actually function. It discussed how the facilities were designed in a looped configuration and that there was evidence showing power flowed over the facilities even when one experienced an outage, proving the facilities were "not just looped on paper." J.A. 474; *see* J.A. 475–76. Finally, on Factor 6, which considers whether meters measure bidirectional flows, the Commission relied on record evidence indicating that the meters were not only technically capable of measuring bidirectional flows but that they also did in fact "measure bidirectional flow between the two systems under both pre- and post-System Reconfiguration conditions." J.A. 490; *see also* J.A. 353.

Throughout the seven-factor analysis, the Commission relied on substantial evidence, "examine[d] the relevant data[,] and articulate[d] a satisfactory explanation for its action." *State Farm,* 463 U.S. at 43. We therefore hold that the Commission's conclusion that the Henderson facilities are "transmission" facilities under the seven-factor test is not arbitrary and capricious.

\*     \*     \*

For the foregoing reasons, the petition for review is denied. Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing *en banc*. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41(a)(1).

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:     /s/
Daniel J. Reidy
Deputy Clerk

6