# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 20, 2023          Decided July 28, 2023

No. 22-1108

GREEN DEVELOPMENT, LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NEW ENGLAND POWER COMPANY, D/B/A NATIONAL GRID,
INTERVENOR

———

Consolidated with 22-1161

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Omar Bustami* argued the cause for petitioner. With him on the briefs was *Anthony P. Campau*.

*Matthew W.S. Estes*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*MaryAnn T. Almeida* argued the cause for respondent-intervenor New England Power Company, d/b/a National Grid. With her on the brief was *David M. Gossett*.

Before: HENDERSON, PILLARD and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Petitioner Green Development, LLC (Green Development) is a developer of solar generation facilities located in Rhode Island. To connect the projects to the electricity grid, Green Development sought interconnection with the distribution system of Narragansett Electric Company (Narragansett), a public utility. Accommodation of the increased flows of electricity required certain upgrades to the transmission system owned by Respondent-Intervenor New England Power Company d/b/a National Grid (NE Power) in order to ensure the continued safe and reliable service of Narragansett's load.

As the transmission owner, NE Power assigned the costs of the transmission system upgrades directly to Narragansett, the transmission customer, pursuant to the ISO New England Tariff, which governs the provision of transmission service in New England. The newly assigned costs were reflected in a revised transmission service agreement (TSA) that NE Power and Narragansett filed for approval by the Federal Energy Regulatory Commission (Commission or FERC). Green Development protested the revised TSA, objecting to the "direct assignment facility" charge for the upgrades because under a separate, state-jurisdictional interconnection agreement governing the solar projects, Narragansett will pass through to Green Development any costs of the transmission system upgrades paid by Narragansett. The Commission

denied Green Development's protest and concluded that the upgrades' costs are properly assigned to Narragansett, the sole benefitting transmission customer, rather than spread across all customers as "network upgrades."

Green Development petitions for review of the relevant FERC orders. Respondent FERC defends the underlying orders as reasonable, as does Intervenor NE Power. As detailed *infra*, each of Green Development's four grounds for vacatur lacks merit. Accordingly, we deny the petitions for review.

## I. Background

The Federal Power Act (FPA) grants FERC exclusive jurisdiction of the transmission and wholesale sale of electricity in interstate commerce. *See* 16 U.S.C. § 824(b). To enforce the FPA's requirements that charges made in connection with the jurisdictional transmission of electric energy be "just and reasonable" and not unduly discriminatory, *see id.* § 824d(a)–(b), section 205 requires that utilities file tariffs reflecting their rates and service terms with the Commission for review, *id.* § 824d(c). The Commission has exclusive jurisdiction of transmission facilities but not of distribution facilities. *See id.* § 824(b)(1).[1]

"In order to foster a more competitive, efficient market for electricity," FERC issued Order No. 888, requiring

---

[1] "FERC has jurisdiction over both the interstate transmission of electricity and the sale of electricity at wholesale in interstate commerce." *Niagara Mohawk Power Corp. v. FERC*, 452 F.3d 822, 824 (D.C. Cir. 2006) (citing 16 U.S.C. § 824(b)(1)). "States retain jurisdiction over retail sales of electricity and over local distribution facilities." *Id.* "Thus transmission occurs pursuant to FERC-approved tariffs; local distribution occurs under rates set by a state's public service commission." *Id.*

transmission providers to "open their networks to transmission customers." *Entergy Servs., Inc. v. FERC*, 391 F.3d 1240, 1243 (D.C. Cir. 2004); *see Promoting Wholesale Competition Through Open Access Nondiscriminatory Transmission Services by Public Utilities*, 61 Fed. Reg. 21540 (May 10, 1996) (Order No. 888). "To effectuate this introduction of competition, FERC required public utilities to 'functionally unbundle' their wholesale generation and transmission services by stating separate rates for each service in a single tariff and offering transmission service under that tariff on an open-access, non-discriminatory basis." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1364 (D.C. Cir. 2004) (citing *New York v. FERC*, 535 U.S. 1, 11 (2002)). Order No. 888 encouraged the creation of independent service operators (ISOs) to "assume operational control—but not ownership—of the transmission facilities owned by its member utilities" in order to "provide open access to the regional transmission system to all electricity generators at rates established in 'a single, unbundled, grid-wide tariff that applies to all eligible users in a non-discriminatory manner.'" *Id.* (quoting Order No. 888, 61 Fed. Reg. at 21596). As relevant here, ISO New England Inc. is the private, non-profit entity authorized by FERC "to administer New England energy markets and operate the region's bulk power transmission system." *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 796 (D.C. Cir. 2007); *see generally Emera Me. v. FERC*, 854 F.3d 9, 16 (D.C. Cir. 2017). It sets forth its rates for access to the transmission system in the ISO New England Transmission, Markets and Services Tariff (Tariff). *ISO New England Inc.*, 178 FERC ¶ 61,115 at PP 3–4 (2022) (February 2022 Order); *see* J.A. 192. The Tariff establishes a two-tier transmission arrangement that integrates regional service, provided by ISO New England, with local network service, provided by participating transmission owners (here, NE Power) under its Schedule 21. February 2022 Order, 178 FERC ¶ 61,115 at P 3.

"When power generators build new facilities or update their existing facilities, they need to connect those facilities to the power grid. That connection in turn often requires transmission owners to upgrade their power lines to accommodate the power influx." *Am. Clean Power Ass'n v. FERC*, 54 F.4th 722, 723–24 (D.C. Cir. 2022) (citing *Ameren Servs. Co. v. FERC*, 880 F.3d 571, 572 (D.C. Cir. 2018)). To determine which entity pays for such transmission upgrades, the Tariff distinguishes "Direct Assignment Facilities"—which are paid for by the sole benefitting transmission customer, *see* Tariff § I.2.2—from "Network Upgrades" that are for the general benefit of all users of the transmission system and therefore recovered from all transmission customers collectively, *see* Tariff, Schedule 21-NEP § I.1.16.

Green Development is building four solar-generation projects in Rhode Island, all located at the same address and producing roughly 40 megawatts (MW) of power in total. February 2022 Order, 178 FERC ¶ 61,115 at P 7. Rather than connect directly to NE Power's higher-voltage transmission grid, as is usually done, Green Development sought to interconnect its projects to Narragansett's lower-voltage distribution system, which is designed to deliver power to end-user customers. *See id.* Narragansett and NE Power, the transmission service provider, studied Green Development's proposed projects and concluded that the projects could not be safely and reliably connected to Narragansett's distribution system without upgrades to both the existing distribution system and the existing transmission system. J.A. 438. The transmission upgrades, which are the upgrades *sub judice*, include a new power substation, known as the Iron Mine Hill Road substation, and related modifications to existing transmission facilities. February 2022 Order, 178 FERC ¶ 61,115 at P 7.

Pursuant to the Tariff, NE Power, the transmission owner, assigned the costs of the transmission system upgrades entirely to Narragansett, the transmission customer, as "Direct Assignment Facilities." *Id.* at P 8. Due to Narragansett's Rhode Island state-jurisdictional tariff, however, Green Development will ultimately bear the direct assignment facility charges, with estimated annual costs of $514,740 (approximately $18 million over the life of the projects). *See Green Dev., LLC*, 176 FERC ¶ 61,193 at P 9 (2021) (Complaint Order).

In February 2021, pursuant to section 206 of the FPA, 16 U.S.C. § 824e(b), Green Development challenged the direct assignment of the upgrades in a complaint filed with the Commission. The Commission concluded that Green Development had "not met its burden of proof under section 206" to demonstrate that the upgrades were not being constructed for the sole use or benefit of Narragansett. Complaint Order, 176 FERC ¶ 61,193 at PP 54–55; *see* 16 U.S.C. § 824e(b) (complainant bears burden of proof to support its claim). It also determined, however, that Green Development *had* met its burden to show that the upgrade facilities were required to be specified in an agreement (among NE Power, Narragansett and ISO New England) before those costs could be assessed to Narragansett under the Tariff definition of "Direct Assignment Facilities." Complaint Order, 176 FERC ¶ 61,193 at P 61. The Complaint Order accordingly granted in part and denied in part Green Development's requested relief.

To comply with the Commission's ruling that the direct assignment facilities be specified in a separate agreement, the filing parties submitted a revised TSA to the Commission pursuant to section 205 of the FPA, 16 U.S.C. § 824d. February 2022 Order, 178 FERC ¶ 61,115 at P 12. Green Development protested the filing. *Id.* at P 21. In the ensuing proceeding,

Green Development challenged the amended TSA which, as before, directly assigned the upgrades to Narragansett. *Id.*

The Commission issued its order approving the amended TSA in February 2022. *See generally* February 2022 Order, 178 FERC ¶ 61,115. It concluded that the TSA "is just and reasonable and not unduly discriminatory or preferential," *id.* at P 55; *see* 16 U.S.C. § 824d, finding in pertinent part that NE Power correctly assigned to Narragansett the transmission upgrade costs necessary to accommodate the projects, *see* February 2022 Order, 178 FERC ¶ 61,115 at PP 59–63, and that certain processes set forth in Schedule 21-Local Service of the Tariff were not required, *see id.* at P 64; *see also* Tariff, Schedule 21-Local Service § II.4.b(i).

Green Development timely filed a request for rehearing. Because FERC failed to act within 30 days, the request was deemed denied in April 2022. 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713(f); *see ISO New England Inc.*, 179 FERC ¶ 62,035 (2022) (citing *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc)). Two months later, in June 2022, FERC issued an order "modifying the discussion" of the denial-of-rehearing order—*i.e.*, explaining the reasons for the denial and—unsurprisingly—reaching the same result. *ISO New England Inc.*, 179 FERC ¶ 61,186 at P 2 & n.5 (Rehearing Order).

Two petitions for review are consolidated for review. Green Development's first petition seeks review of the February 2022 order and the April 2022 denial-of-rehearing order. Green Development's second petition seeks review of the June 2022 Rehearing Order. We have jurisdiction of the petitions pursuant to section 313(b) of the FPA. 16 U.S.C. § 825*l*(b).

## II. Analysis

Under the Administrative Procedure Act, we "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "In a 'technical area like electricity rate design,' we give FERC a significant degree of deference." *La. Pub. Serv. Comm'n v. FERC*, 10 F.4th 839, 845 (D.C. Cir. 2021) (quoting *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016)). "We must accept FERC's factual findings if they are 'supported by substantial evidence.'" *Id.* (quoting 16 U.S.C. § 825*l*(b)). "We must also defer to FERC's reasonable interpretation of tariffs and of its own prior orders." *Id.* (citations omitted). As to the Commission's tariff interpretation, we employ a "*Chevron*-like analysis." *Id.* at 845–46 (quoting *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011)). "Under that framework, we must enforce unambiguous tariff language, but we defer to FERC's reasonable interpretation of ambiguous text." *Id.* (citing *PSEG*, 665 F.3d at 208).

Green Development contends that the Commission (1) erroneously concluded that Green Development's arguments in the underlying section 205 proceeding operated as a "collateral attack" on the Complaint Order; (2) improperly applied the governing seven-factor test to determine its jurisdiction of the upgrades, which Green Development contends are state-jurisdictional distribution facilities, not transmission facilities; (3) misinterpreted the Tariff's definition of "direct assignment facilities"; and (4) erroneously failed to apply the filing procedures of Schedule 21-Local Service of the Tariff.

## A.    Collateral Attack

We start with Green Development's contention that the decision under review—the Rehearing Order, 179 FERC ¶ 61,186—improperly gave preclusive effect to the Complaint Order. As noted *supra*, the Complaint Order granted in part and denied in part the relief Green Development's section 206 complaint sought. 176 FERC ¶ 61,193. In the Complaint Order, the Commission held in pertinent part that Green Development failed to meet its burden on the issue whether the transmission system upgrades were for the sole benefit or use of Narragansett. *Id.* at P 55. It also held, however, that the upgrades were not "Direct Assignment Facilities" under the Tariff because they had not yet been specified in a separate agreement among ISO New England, NE Power and Narragansett. *Id.* at P 61.

NE Power and ISO New England subsequently filed with the Commission the requisite separate agreement, *see* February 2022 Order, 178 FERC ¶ 61,115 at P 12; *see also* J.A. 89 (adding new Attachment 3 to the TSA to specify the upgrades as direct assignment facilities), and this section 205 proceeding followed. In the section 205 proceeding, the Commission accorded some preclusive effect to the Complaint Order, finding that "Green Development's arguments regarding whether the upgrades meet the definition of Direct Assignment Facilities represent a collateral attack on the Commission's order in the Green Development Complaint proceeding, and therefore we dismiss them." February 2022 Order, 178 FERC ¶ 61,115 at P 61. It further concluded that Green Development's argument regarding the filing parties' failure to follow Schedule 21-Local Service's "required" procedures represented "a collateral attack on the Complaint Order," *id.* at P 64, as did Green Development's argument that the Commission lacked jurisdiction of the upgrades, *id.* at P 66.

In its rehearing request, Green Development disputed the Commission's characterization of Green Development's challenge as a collateral attack on the Complaint Order. *See* J.A. 162–65, 171–74; *see also* Rehearing Order, 179 FERC ¶ 61,186 at P 39. It argued that *res judicata* and collateral estoppel doctrines did not apply because, notwithstanding Green Development had the burden of proof in the section 206 proceeding, *see* 16 U.S.C. § 824e(b), NE Power had the burden of proof in the section 205 proceeding "to show that the increased rate or charge is just and reasonable," *id.* § 824d(e). In the Rehearing Order, however, the Commission clarified its February 2022 order, noting:

> In the February 2022 Order, the Commission's ruling did not solely rest on the characterization of Green Development's arguments as a collateral attack. In addition, in this order the Commission is further addressing Green Development's arguments. *Given that the Commission has decided each of these issues on the merits*, we believe we have satisfied our obligation under section 205 to ensure that the Filing Parties' revised TSA is just and reasonable and not unduly discriminatory or preferential.

Rehearing Order, 179 FERC ¶ 61,186 at P 41 (emphasis added). As the Rehearing Order relates that it "has decided each of these issues on the merits," *id.*, we believe the Commission has cured any purportedly erroneous ruling that Green Development's section 205 protest constituted a collateral attack on the Complaint Order. *See BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1183 (D.C. Cir. 2003) ("When an agency offers multiple grounds for a decision, we will affirm the agency so long as any one of the grounds is valid, unless it is

demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable.").

## B.    Commission's Seven-Factor Test

Next, we review the Commission's conclusion that the upgrades at issue are FERC-jurisdictional transmission facilities. To distinguish "Commission-jurisdictional facilities used for transmission in interstate commerce" from "state-jurisdictional local distribution facilities," *see* Order No. 888, 61 Fed. Reg. at 21626, the Commission has identified seven relevant factors, *see id.*, at 21619–20. The factors are:

> (1) local distribution facilities are normally in close proximity to retail customers; (2) local distribution facilities are primarily radial[2] in character; (3) power flows into local distribution systems, and rarely, if ever, flows out; (4) when power enters a local distribution system, it is not reconsigned or transported onto some other market; (5) power entering a local distribution system is consumed in a comparatively restricted geographic area; (6) meters are based at the transmission/local distribution interface to measure flow into the local distribution system; and (7) local distribution systems will be of reduced voltage.

*S. California Edison Co.*, 153 FERC ¶ 61,384 at P 4 (2015).

---

[2]  A radial line is "a transmission or distribution line that carries power in only [one] direction, similar to a one-way street." *Sw. Power Pool, Inc.*, 149 FERC ¶ 61,051 at P 19 (2014) (quotation omitted).

Green Development contends that the Commission "failed to give comprehensive consideration as to how the totality of the circumstances bears on each of FERC's seven factors for determining whether facilities are FERC-jurisdictional transmission facilities or state-jurisdictional distribution facilities." Pet'r Br. 45.[3] The Commission's Rehearing Order, however, comprehensively analyzed and applied each of the factors to the identified upgrades. *See* Rehearing Order, 179 FERC ¶ 61,186 at PP 15–16 (evaluating factor one), PP 17–18 (evaluating factor two), PP 19–20 (evaluating factor three), PP 21–22 (evaluating factors four and five), PP 23–24 (evaluating factor six), PP 25–26 (evaluating factor seven). The Commission concluded that six factors indicated FERC-jurisdictional status, with only factor six being inconclusive. *Id.* at P 27. We "must accept FERC's factual findings if they are 'supported by substantial evidence.'" *La. Pub. Serv. Comm'n*, 10 F.4th at 845 (quoting 16 U.S.C. § 825*l*(b)).

Substantial evidence supports the Commission's conclusion that the upgrades are jurisdictional transmission facilities. The Commission explained that the upgrades operate at the same voltage as the surrounding transmission infrastructure and allow power to flow freely into and out of the substation and transmission system. Rehearing Order, 179 FERC ¶ 61,186 at PP 12, 20, 25; *see also* February 2022 Order, 178 FERC ¶ 61,115 at PP 68–70. Moreover, the facilities are not connected to end users; rather, they facilitate

---

[3] FERC argues that Green Development waived its challenge to the jurisdictional status of the upgrades by failing to contest in its opening brief the February 2022 order's ruling that its jurisdictional challenge represented a collateral attack on the Complaint Order. *See* Resp. Br. 48–51. As explained *supra*, however, the Rehearing Order read the February 2022 order's collateral-attack rulings as having decided the issue "on the merits." Rehearing Order, 179 FERC ¶ 61,186 at P 41. The issue is therefore properly before us.

the movement of power onto a transmission line to serve Narragansett's retail load connected to other transmission nodes. Rehearing Order, 179 FERC ¶ 61,186 at P 16. Because of this configuration, most of the factors (*i.e.*, voltage, direction of power flow, proximity to retail customers, radial or non-radial character) support jurisdictional status. The Commission also explained that Green Development's counterarguments mainly focused on the lower-voltage 34.5-kV distribution feeder connected to the upgrades; it is not designated as a direct assignment facility, however, and neither its costs nor its jurisdictional status is at issue. *Id.* at P 12; *see also* February 2022 Order, 178 FERC ¶ 61,115 at P 68.

Green Development's objections do not overcome the substantial deference owed the Commission on this technical fact question. Regarding factor one, Green Development points out that the power routed through the facilities will eventually serve Narragansett's retail load. Pet'r Br. 47–48. But the critical issue is *proximity* to retail customers, *see S. California Edison*, 153 FERC ¶ 61,384 at P 4, not whether power will eventually serve them. The Commission reasonably explained that the facilities have no proximate connection to retail customers because their purpose is to move power onto a transmission line. Regarding factor two, Green Development asserts that the Commission's conclusion was insufficiently reasoned but provides no affirmative argument that the facilities have a radial character. *See* Pet'r Br. 48–50. We thus have no reason to discount the Commission's conclusion, which drew on studies diagramming the upgrades to conclude that they are not radial in character. Rehearing Order, 179 FERC ¶ 61,186 at PP 17–18. Regarding factor three, the Commission explained that "[p]ower will flow into the Iron Mine Hill Road Substation and associated facilities from the 34.5-kV distribution feeder and will then flow out onto the H17 transmission line." *Id.* at P 20. Green Development faults the

Commission for failing to quantify these power flows but it does not dispute the Commission's qualitative analysis, which shows that the upgrades will handle significant power inflows and outflows. The Commission also reasonably explained that factors four and five support jurisdictional status because power entering the facilities will flow over what are concededly FERC-jurisdictional transmission lines before being distributed to retail customers. *Id.* at PP 21–22. And Green Development offers nothing to cast doubt on the Commission's conclusion that factor seven supports jurisdictional status because the facilities operate at the same voltage as the surrounding transmission infrastructure. Finally, although the Commission acknowledged that factor six is more equivocal, *id.* at P 24, it reasonably concluded that the totality of the factors favors jurisdiction. The Commission's conclusion was thus supported by substantial evidence.

## C.    Direct Assignment Facilities

Next, we address Green Development's challenge to the Commission's conclusion that the transmission system upgrades are "direct assignment facilities" under the Tariff's governing definition. As discussed *supra*, under the Tariff, upgrades to a transmission system fall into one of two categories: (1) direct assignment facilities, whose costs are assessed directly (solely) to the benefitting transmission customer; or (2) network upgrades, whose costs are shared among the benefitting transmission customers.

The Tariff treats a facility as a direct assignment facility if it meets two criteria:

> (1) it is "constructed for the sole use/benefit of a particular Transmission Customer requesting service under the OATT [Open-Access

> Transmission Tariff] or a Generator Owner requesting an interconnection"; and
>
> (2) it is "specified in a separate agreement among the ISO, Interconnection Customer and Transmission Customer, as applicable, and the Transmission Owner whose transmission system is to be modified to include and/or interconnect with the Direct Assignment Facilities."

Tariff § I.2.2. On review, Green Development challenges only the first criterion, arguing that the upgrades cannot constitute direct assignment facilities because "those upgrades must be caused by and directly attributable to a particular customer *requesting* service." Pet'r Br. 25 (emphasis in original). Green Development relies on the present-participle tense of the Tariff's "requesting service" language, *see id.* at 24–32, to support its position that a direct assignment facility must be associated with a "*contemporaneous* request for transmission service." *Id.* at 26 (emphasis in original).

The Commission rejected Green Development's interpretation, holding:

> Although the phrase "Transmission Customer requesting service under the OATT" would include a new Transmission Customer seeking service under the OATT for the first time, we think it equally reasonable to read the participle phrase "requesting service" in the definition's reference to facilities "constructed for . . . a particular Transmission Customer requesting service" to equally include an existing Transmission Customer that has previously

> formally requested and received service under
> the OATT.

Rehearing Order, 179 FERC ¶ 61,186 at P 32.

We first determine whether the Tariff "unambiguously addresses" the matter at issue. *PSEG*, 665 F.3d at 208 (quoting *Colo. Interstate Gas Co. v. FERC*, 599 F.3d 698, 701 (D.C. Cir. 2010)). Because the Tariff does not, we "defer to the Commission's construction of the provision at issue so long as that construction is reasonable." *Id.* (quoting *Colo. Interstate*, 599 F.3d at 701). Here, the Commission's interpretation is reasonable because it properly serves the purpose of direct assignment, which "protects all network users from unfairly subsidizing facilities that benefit a single user." *S. Co. Servs., Inc.*, 116 FERC ¶ 61,247 at P 17 (2006). This purpose would not be served if a single benefitting transmission customer could avoid bearing the costs of the facilities based solely on the timing of its transmission request.

### D.    Schedule 21-Local Service Filing Procedure

Finally, we reject Green Development's fourth claim, namely, that the filing parties failed to file a new application for transmission service pursuant to Schedule 21-Local Service of the Tariff. *See generally* Tariff, Schedule 21-Local Service. Schedule 21-Local Service sets out the general conditions applicable to an eligible customer requesting "Local Network Service" from NE Power. Complaint Order, 179 FERC ¶ 61,186 at P 6. Green Development contends that NE Power failed to comply with the requirements of Schedule 21-Local Service before assessing a direct assignment facility charge for the Upgrades. Specifically, Schedule 21-Local Service requires a "System Impact Study" (SIS) to be completed to "identify any system constraints, additional Direct Assignment Facilities or Local Network Upgrades required to provide the requested

service." Tariff, Schedule 21-Local Service § II.7.c. And section II.4.b(i) of Schedule 21-Local Service provides:

> A Transmission Customer who wishes to . . . make upgrades (i.e., increase MWs served) within the terms of the existing Local Service Agreement under this Schedule 21, shall not be required execute [sic] a new Local Service Agreement under this Schedule 21, however, modifications to the existing Local Service Agreement under this Schedule 21 may be required. Such modifications to an existing Local Service Agreement typically do not require an additional Local or Regional System Impact Study to be completed. The Transmission Customer shall complete (and submit to the ISO) an application for Local Transmission Service that reflects the requested modifications to the Local Service Agreement to facilitate revision of its existing Schedule 21 Local Service Agreement.

Tariff, Schedule 21-Local Service § II.4.b(i).

Here, Green Development asserts, Narragansett failed to complete and submit an application for Local Transmission Service reflecting the revised modifications, *i.e.*, the upgrades at issue, to "facilitate revision" of the TSA. Pet'r Br. 38. Moreover, Green Development contends, ISO New England and NE Power failed to complete the required SIS before identifying the direct assignment facility charges in the revised TSA. *See id.*; *see also id.* at 11–13 (identifying Schedule 21-Local Service's purportedly mandatory process for identifying direct assignment facilities). In light of these two deficiencies, Green Development contends, the Commission should have

rejected the revised TSA because the direct assignment facility charges constitute a departure from the filed rate. *See id.* at 38 & n.10.

The problem with Green Development's contention, however, is that it presumes that the procedures in Schedule 21-Local Service, including the completion of both a new application for Local Transmission Service and an additional SIS, are "mandatory processes" that applied to the filing of the TSA. *See id.* at 38. But, as the Commission explained in the Complaint Order, the SIS and associated technical arrangements "pertain to *initiating* transmission service," and "do not demonstrate that Narragansett as an *existing* transmission customer was required to request new transmission service" under the Tariff. Complaint Order, 176 FERC ¶ 61,193 at P 57 (emphasis added). "Further," the Complaint Order observed, "Schedule 21-LS [Local Service] contemplates that modifications to an existing service agreement 'may' be required but are not directed under Schedule 21-LS." *Id.* (quoting Tariff, Schedule 21-Local Service § II.4.b(i)) The Commission relied on this reasoning in its Rehearing Order. *See* Rehearing Order, 179 FERC ¶ 61,186 at P 29 & n.79 (citing 178 FERC ¶ 61,115 at P ¶ 64 & n.114); *see also Entergy Ark., LLC v. FERC*, 40 F.4th 689, 700 n.5 (D.C. Cir. 2022) (Commission may rely on reasoning in earlier orders). The Rehearing Order also iterated the Commission's determination that Green Development "only makes unsupported statements that these processes are required in this specific instance and have not occurred." Rehearing Order, 179 FERC ¶ 61,186 at P 29 & n.80.

For the foregoing reasons, the petitions for review are denied.

*So ordered.*